IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ISRAEL HERNANDEZ, JUAN LUIS NUNEZ, AND FELIPE CORREA,<br><br>    Plaintiffs,<br><br>v.<br><br>DELTA STONE PRODUCTS, INC., MOUNTAIN VALLEY STONE, INC., RJ MASONRY, INC. D/B/A MOUNTAIN WEST SEALING & COATINGS, LEGACY MACHINERY, AND RMD MANAGEMENT, INC.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:23-cv-00346-JNP-JCB<br><br>Chief District Judge Jill N. Parrish<br><br>Magistrate Judge Jared C. Bennett |

Defendants Delta Stone Products, Inc. ("Delta Stone"), Mountain Valley Stone, Inc. ("Mountain Valley"), RJ Masonry, Inc. d/b/a Mountain West Sealing & Coatings, ("RJ Masonry"), Legacy Machinery, and RMD Management, Inc. ("RMD") (collectively "Defendants") move for summary judgment on all claims. ECF No. 37 ("Defs.' Mot."). For the reasons discussed below, the motion is GRANTED.

## BACKGROUND[1]

Plaintiffs Israel Hernandez, Juan Luis Nunez, and Felipe Correa (collectively, "Plaintiffs") were "employed by RMD and worked for Delta Stone." ECF No. 38-3 ("Ex. C") ¶ 8. They bring

---

[1] In presenting this background, the court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to [Plaintiffs, as] the nonmoving party" in accordance with

claims against Defendants RMD, Delta Stone,  Mountain Valley, RJ Masonry, and Legacy Machinery for allegedly illegal employment practices. ECF No. 8 ("First Am. Compl.").

Delta Stone "primarily makes its revenue by cutting stone," which involves "fabricating blocks of stone into specific pieces and sizes and shapes that are specified by architects and home owners." ECF No. 38-2 ("Ex. B") at 71. It is owned by Robert Hicken and Paul Ballif, who also own the remaining defendant entities. *Id.* at 13–14. Mountain Valley operates a stone quarry, RJ Masonry is a stone masonry contractor that installs stone products, and Legacy Machinery maintains the industrial equipment and machinery used by the other entities. Ex. C ¶ 9. Meanwhile, RMD is a management services company that formally employs everyone who works for the four other entities. Ex. B at 9–10. RMD leases these employees to the other defendants, manages payroll and benefits, and provides other administrative services. *Id.* at 9–13.

The positions at Delta Stone include (1) packers or laborers[2] who transport materials and provide "general labor around the shop"; (2) operators who "operate [the] machines" that cut stones; and (3) supervisors who also operate machines and have additional supervisory responsibilities. ECF No. 38-4 ("Ex. D") at 5; ECF No. 38-8 ("Ex. H") at 17. All three positions, which require that employees spend most of their time in the workshops where stones are cut, involve a substantial risk of inhaling silica dust. Ex. C ¶ 7; ECF No. 46-12 ("Ex. 12") at 61–62. Air quality tests indicated that areas within the workshops had substantial silica levels, which

---

the standard for granting summary judgment. *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). The court draws extensively on both Defendants' and Plaintiffs' appendix of exhibits, which are labeled numerically and alphabetically respectively. *See* ECF No. 38 ("Defs.' App."); ECF No. 46 ("Pls.' App.").

[2] Based on the evidence presented by the parties, it appears that these terms are interchangeable. Regardless, no party raises any argument that turns on these terms having distinct meanings.

triggered obligations for Defendants to take mitigative measures under regulations set by the Occupational Safety and Health Administration ("OSHA"). 29 C.F.R. § 1910.1053(b); ECF No. 46-14 ("Ex. 14"). At times, the concentration of silica even exceeded the "[p]ermissible exposure limit" set by OSHA. Ex. 14; 29 C.F.R. § 1910.1053(c). This exposure can result in silicosis, which "is a disease of silica dust deposition in the lungs" for which there currently "is no treatment." ECF No. 38-15 ("Ex. O").

At Delta Stone, most of the employees working on the shop floors—which involved the greatest risk of silica dust exposure—were Spanish-speaking Latinos of Hispanic descent. ECF No. 38-13 ("Ex. M") at 13; ECF No. 38-12 ("Ex. L") at 100; ECF No. 38-7 ("Ex. G") at 89; ECF No. 38-11 ("Ex. K") at 154–57. Meanwhile, White English-speaking staff primarily worked in the office, which contained undetectable levels of silica. ECF No. 38-1 ("Ex. A") at 20–21; Ex. H at 22, 26; Ex. G at 89; ECF No. 38-25 ("Ex. Y").

All three plaintiffs are Spanish-speaking Latinos of Mexican descent and spent substantial time working in Delta Stone's shops as packers, operators, or supervisors. Ex. L at 8, 13, 27–29; Ex. H at 9, 18–22; Ex. G at 7–8, 12, 16. Hernandez was diagnosed with silicosis and expressed that he was uncomfortable returning to his work on the shop floor, at which point he no longer returned to work at Delta Stone. Ex. L at 14, 19–23. Nunez similarly was diagnosed with silicosis and maintains that he was reassigned to a long-term position involving full-time office work off the shop floor. Ex. H at 45–46; ECF No. 38-28 ("Ex. AB"); ECF No. 46-6 ("Ex. 6") ¶¶ 2, 8–9. But Delta Stone eventually informed Nunez that it could only offer him 2–3 hours of office work per day and any additional work would be in the shop floor, whereupon Nunez stopped working for Delta Stone. Ex. H at 48–49; ECF No. 38-29 ("Ex. AC"). Correa requested time off in connection with an arm injury and the psychological toll of receiving his silicosis diagnosis. Ex. G at 52; Ex.

O. The parties dispute what transpired next, with Correa claiming that he was terminated for taking time off and Defendants claiming that Correa simply chose not to return even though they repeatedly told Correa he was welcome back. *Compare* Defs.' Mot. at 15–17 *with* Pls.' Opp'n at 20–21 (collecting evidence supporting their respective positions).

Plaintiffs initiated this action and bring seven claims against Defendants, some of which are overlapping and others which are brought only by specific plaintiffs. ECF No. 2 ("Compl."); First Am. Compl. First, Correa brings claims against Delta Stone and RMD for failure to provide reasonable accommodations and retaliation under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–17. First Am. Compl. ¶¶ 100–12. Next, Nunez and Correa bring claims against all defendants for (1) failure to provide reasonable accommodations and retaliation under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, (2) wrongful termination in violation of public policy under Utah law, and (3) failure to provide federally protected leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–54. *Id.* ¶¶ 113–48. Finally, all plaintiffs bring claims against all defendants under 42 U.S.C. § 1981 for discrimination "based upon their race, color, ancestry, and ethnicity" as "Spanish-speaking Latino employees of Mexican descent." *Id.* ¶¶ 149–56. Plaintiffs request various forms of relief, including injunctions, damages, and attorney fees. *Id.* at 28–29.

Defendants, in turn, move for summary judgment on all of Plaintiffs' claims for relief. Defs.' Mot. As an initial matter, they argue that Mountain Valley, RJ Masonry, and Legacy Machinery were not Plaintiffs' employers under the relevant legal test for joint liability and thus are not proper defendants. *Id.* at 22–24. They further argue that all of Plaintiffs' claims fail as a matter of law, irrespective of joint liability. *Id.* at 24–44. In their memorandum in opposition, Plaintiffs indicate that they no longer "pursue their claims of wrongful termination in violation of

4

public policy due to information yielded during discovery" and "concede [that] Correa's disability-based claims" cannot be brought under the Rehabilitation Act and instead can only be brought under the ADA. Pls.' Opp'n at 32 n.4, 44 n.6. But otherwise they oppose Defendants' motion.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of "demonstrat[ing] the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016) (quoting *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1265–66 (10th Cir. 2015)).

Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). To do so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When applying the summary judgment standard, the court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). However, this does not mean that nonmovants may "defeat summary judgment by relying on ignorance of the facts, on speculation, or on suspicion." *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (citation

modified). "Rather, to defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (citation modified). "To withstand summary judgment, the nonmoving party must establish the elements essential to his case on which he bears the burden of proof at trial." *Treff v. Galetka*, 74 F.3d 191, 195 (10th Cir. 1996).

**DISCUSSION**

As an initial matter, in light of Plaintiffs' concessions, the court enters summary judgment in favor of Defendants on Correa's Rehabilitation Act claims and Correa's and Nunez's wrongful termination in violation of public policy claim. *See* First Am. Compl. ¶¶ 113–15, 117, 121–25, 132–41. The court addresses the remaining issues in the following order: (1) whether Mountain Valley, RJ Masonry, and Legacy Machinery are proper defendants; (2) Correa's accommodation and retaliation claims under the ADA; (3) Nunez's accommodation and retaliation claims under the Rehabilitation Act; (4) Correa's and Nunez's FMLA claims; and (5) the § 1981 discrimination claims raised by all plaintiffs.

## I.  Peripheral Defendants

The court begins with the three defendants—Mountain Valley, RJ Masonry, and Legacy Machinery (collectively, "Peripheral Defendants")—that are most attenuated from Plaintiffs' claims. Plaintiffs allege that all five defendants operate as a single employer and, accordingly, seek to hold all defendants jointly liable under the Rehabilitation Act, the FMLA, and § 1981 as a single employer. First Am. Compl. ¶¶ 15–16. Defendants argue that there is insufficient evidence to extend liability to Peripheral Defendants. Defs.' Mot. at 22–24; Pls.' Opp'n at 22–23.

Under Tenth Circuit caselaw, there are two distinct tests that may apply when an employee seeks to hold multiple entities jointly liable as her employers. *See Knitter v. Corvias Mil. Living,*

6

*LLC*, 758 F.3d 1214, 1226–27 (10th Cir. 2014); *Bristol v. Bd. of Cnty. Comm'rs of Cnty. of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002). On the one hand, "a plaintiff who is the employee of one entity may seek to hold another entity liable by claiming that the two entities are *joint employers*." *Bristol*, 312 F.3d at 1218 (emphasis added). This requires the plaintiff to show that the entities are joint employers under a test that "looks to whether they co-determine the essential terms and conditions of employment." *Id.* On the other hand, "a plaintiff who is the employee of one entity may seek to hold another entity liable by arguing that the two entities effectively constitute *a single employer*." *Id.* (emphasis added). Here, plaintiffs must show under the single employer test that "two [or more] nominally separate entities should in fact be treated as an integrated enterprise" given the following "four factors: '(1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control." *Id.* at 1218, 1220 (quoting *E.E.O.C. v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 571 (6th Cir. 1984)). While "the joint employer test . . . focuses on the relationship between an employee and its two potential employers, the single employer test focuses on the relationship between the potential employers themselves." *Knitter*, 758 F.3d at 1227.

Defendants assert that "[t]here is no dispute that Delta Stone and RMD (and the remaining Defendants) are separate entities" and therefore, joint liability "should be analyzed using the joint-employer test." Defs.' Mot. at 23. They concede that Delta Stone and RMD qualify as joint employers under the joint employer test—and thus would be jointly liable for any unlawful employment practices—but argue that there is insufficient evidence to hold Peripheral Defendants jointly liable because "there is no evidence that [they are] involved with the management of Delta Stone employees." *Id.* at 23–24. In response, Plaintiffs insist that they have "alleged that all [d]efendant entities operate as one single employer," which means that the single employer test is

7

the relevant standard for joint liability. Pls.' Opp'n at 22. They further argue that there is sufficient evidence for joint liability under this test because the evidence establishes that "[d]efendant entities operate as one single employer and thus should be treated as an integrated enterprise." *Id.* at 22–23. In their reply memorandum, Defendants argue that Plaintiffs have failed to establish the first factor under the single employer test, interrelations of operation, and go astray by relying "on the nexus between each [d]efendant and RMD," as opposed to "each [d]efendant and Delta Stone." ECF No. 61 ("Defs.' Reply") at 22.

At the outset, the court agrees with Plaintiffs that they allege that "all [d]efendant entities operate as one single employer" and thus the single employer test is the relevant standard for joint liability. Pls.' Opp'n at 22. While it may be undisputed that Defendants "are separate entities" as a formal matter, Plaintiffs clearly allege in the operative complaint and argue in their briefing that this separation is merely "nominal" and that the "separate entities should in fact be treated as an integrated enterprise"—placing their allegations in the heartland of the single employer test. Defs.' Mot. at 23; *Knitter*, 758 F.3d at 1226–27 (citation modified); First Am. Compl. ¶¶ 15–16; Pls.' Opp'n at 22–23.

Plaintiffs offer ample evidence that the requirements for joint liability under the single employer test are satisfied. They cite extensive deposition evidence that "all five [d]efendant entities are owned by the same two owners; share the same corporate address; have all hiring, firing, and promotion decisions approved by at least one owner; have consolidated payroll, employee benefit programs, and safety operations under . . . RMD . . . ; [and] the two owners have ultimate financial decision-making authority for all five entities." *Id.* at 22–23; Ex. B at 9–15, 25–26, 36; Ex. A at 10–12. When rational inferences are drawn in Plaintiffs' favor, this evidence clearly establishes the last three factors of the single employer test—common management, centralized

8

control of labor relations, which is "the most important" factor, and common ownership and financial control—and Defendants do not even attempt to argue otherwise. *Bristol*, 312 F.3d at 1220; Defs.' Reply at 22.

Defendants argue that Plaintiffs fail to provide sufficient evidence with respect to interrelations of operations and invoke the "seven indicia of interrelatedness," initially formulated by the National Labor Relations Board, that have been used by lower courts in applying the test. *Tatum v. Everhart*, 954 F. Supp. 225, 228 (D. Kan. 1997); Defs.' Reply at 22. These indicia include the following: "(1) combined accounting records; (2) combined bank accounts; (3) combined lines of credit; (4) combined payroll preparation; (5) combined switchboards; (6) combined telephone numbers; and (7) combined offices." *Tatum*, 954 F. Supp. at 228 (quoting *Eichenwald v. Krigel's, Inc.*, 908 F. Supp. 1531, 1540, 1541 n.8 (D. Kan. 1995)). But it is unclear how much weight should be put on these indicia—including switchboards and telephone numbers—in the twenty-first century. And, in fact, there is evidence that Defendants combined their payroll operations through RMD. Ex. B at 9–11.

In any event, even if the court assumes for the sake of argument that Plaintiffs have failed to establish interrelatedness, the Tenth Circuit has held that "[a]ll four factors . . . are not necessary for single-employer status." *Ceco Concrete Const., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d 1250, 1254 (10th Cir. 2016) (quoting *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1184 (10th Cir. 1999)). Given the evidence establishing the other factors, Plaintiffs clearly have succeeded at "the heart of the inquiry," which involves showing the "absence of an arm's-length relationship among the companies." *Id.* (quoting *Knowlton*, 189 F.3d at 1184). It strains credulity for Defendants to suggest otherwise given the role that RMD and the two owners play in managing all five entities as one integrated enterprise.

Defendants also argue that Plaintiffs' evidence is insufficient because it establishes a "nexus between each [d]efendant and RMD—not each [d]efendant and Delta Stone." Defs.' Mot. at 22. But this argument fundamentally misunderstands the nature of the single employer test. Even if RMD, rather than Delta Stone, is the brains of the operation that coordinates the other entities, Delta Stone and Peripheral Defendants still have shared management, are controlled through RMD's centralized operations, and have the same two owners. This more than suffices to establish that Defendants did not function at arms-length but instead operated as distinct divisions of a single enterprise, which is all the single employer test requires.

Therefore, the court finds that Plaintiffs have offered sufficient evidence to hold Defendants jointly liable for any misconduct under the single employer test. Defendants' arguments otherwise are unpersuasive and do not support dismissing the claims against Peripheral Defendants.

## II.     Correa's ADA Claims

The court now turns to Correa's accommodation and retaliation claims under the ADA.

### A.      Accommodation Claim

The "test for establishing a prima facie failure-to-accommodate claim is not an onerous one" and simply requires the plaintiff to establish the following elements: "(1) she was disabled; (2) she was otherwise qualified; (3) she requested a plausibly reasonable accommodation; and (4) [the d]efendant[s] refused to accommodate her disability." *Norwood v. United Parcel Serv., Inc.*, 57 F.4th 779, 786 (10th Cir. 2023). The parties do not dispute that Correa has established the first two elements by virtue of his silicosis, which qualifies as a disability, and his work history. Defs.' Mot. at 25–26; Pls.' Opp'n at 36; Defs.' Reply at 2–4. *See* Ex. O (Correa's silicosis diagnosis); Ex. G at 15–16 (Correa's work history). Thus, the only remaining question is whether

the evidence establishes that Correa requested a plausibly reasonable accommodation that was denied by Defendants.

In the operative complaint, Correa alleges that he "requested a reasonable accommodation of time off due to mental health concerns related to his recent silicosis diagnosis and upcoming shoulder surgery," which was denied "beyond [the] ten days of paid vacation." First Am. Compl. ¶¶ 103–04. Defendants respond that it "is undisputed that Correa [only] requested to use his vacation time and take 10 days (two work weeks) off due to his poor mental state" and this accommodation "was granted by Delta Stone." Defs.' Mot. at 25. Plaintiffs counter that "the evidence demonstrates that Correa's request for time off was actually broader— namely, to use all the leave available to him in order to recover physically from his shoulder surgery[] and mentally from his silicosis diagnosis." Pls.' Opp'n at 36. Specifically, Plaintiffs argue that the content of Correa's communication—that "he was 'going to need some time to process what was going'"— in conjunction with Defendants' conduct and their knowledge of Correa's upcoming surgery supports a reasonable inference that Correa "request[ed] for extended leave" that Defendants failed to provide. *Id.* at 36–38 (quoting Ex. G at 92). In reply, Defendants challenge Plaintiffs' interpretation of the broad nature of Correa's request. Defs.' Reply at 2–3. In the alternative, they argue that even if Plaintiffs' interpretation is assumed, Correa requested indefinite leave that is unreasonable as a matter of law. *Id.* at 3–4.

The court agrees with Defendants' alternative argument and thus holds that Correa has failed to provide sufficient evidence to support his failure-to-accommodate claim. The Tenth Circuit has explicitly held that "a request for indefinite leave is not reasonable as a matter of law." *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 676 (10th Cir. 2021). It explained:

11

> For a leave request to be reasonable, an employee must provide an *expected duration of the impairment* (not the duration of the leave request). This is because a reasonable accommodation refers to those accommodations which presently, or in the *near future*, enable the employee to perform the essential functions of his job. And without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job *in the near future*.

*Id.* at 676–77 (citation modified) (emphasis in original). *See also Cline v. Clinical Perfusion Sys., Inc.*, 92 F.4th 926, 934 (10th Cir. 2024) ("This court's case law indicates the importance of providing employers with notice of the expected duration of the employee's recovery when either paid or unpaid leave is the suggested 'reasonable accommodation.'"); *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996) (holding that the plaintiff's request for leave for the duration of her impairment was unreasonable as a matter of law because the "plaintiff has failed to present any evidence of [its] expected duration . . . as of the date of her termination"). Here, there is no evidence suggesting that Correa provided *any* information regarding how long it would take him to recover from his shoulder surgery and the psychological toll of his silicosis diagnosis—and whether it would be a matter of days, weeks, or months. Thus, to the extent that Correa requested leave beyond the two weeks he initially requested and was given, he fails to provide sufficient evidence that his request was reasonable.

Therefore, the court concludes that Correa's requests were either granted in the case of the two-week leave or unreasonable in the case of indefinite leave and, accordingly, enters summary judgment in Defendants' favor on Correa's ADA failure-to-accommodate claim.

B.    Retaliation Claim

The court next addresses Correa's retaliation claim under the ADA, which requires Correa to establish the following elements: (1) "he engaged in protected opposition to discrimination";

(2) "a reasonable employee would have found the challenged action materially adverse"; and (3) "a causal connection existed between the protected activity and the materially adverse action." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011) (quoting *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007)). Correa alleges that his request for time off constituted statutorily protected activity and caused Defendants to engage in the materially adverse action of "terminat[ing] his employment for alleged job abandonment." First Am. Compl. ¶¶ 109–10.

Defendants move for summary judgment on the grounds that there is insufficient evidence establishing that Correa suffered a materially adverse action. Defs.' Mot. at 26. In the context of an ADA retaliation claim, a plaintiff establishes an adverse action by "show[ing] that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). Here, Plaintiffs contend that "Correa was subject to the adverse employment action of termination on or about January 25th, 202[2]" but offer insufficient evidence to support their contention.[3] Pls.' Opp'n at 38.

The Tenth Circuit has held that "[a]n actual discharge occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe his tenure has been terminated." *Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008) (citation

---

[3] Although Plaintiffs write "January 25th, *2021*" in their opposition brief, it is clear from the surrounding context that the alleged adverse employment action occurred in 2022 and that the 2021 date is a mistake. Pls.' Opp'n at 38 (emphasis added).

modified). As an initial matter, Correa's contention that he was terminated in January 2022 appears to be plainly inconsistent with the record because there is overwhelming evidence that "Delta Stone repeatedly told Correa he was welcome to return to work if he so desired" throughout January and early February. Def.'s Mot. at 25; ECF No. 38-16 ("Ex. P"); ECF No. 38-20 ("Ex. T"); ECF No. 38-21 ("Ex. U"), ECF No. 38-22 ("Ex. V"). All of this suggests that Correa could not have reasonably believed he was terminated for requesting time off in January 2022.

In arguing otherwise, Plaintiffs primarily rely on an email exchange between Defendants and Correa's insurance company indicating that Correa had been terminated on December 31, 2021. Pls.' Opp'n at 38 (citing ECF No. 46-5 ("Ex. 5")). But this email exchange simply reflected Defendants' understanding that Correa had "terminated [his] employment" through deciding to quit, which Defendants assumed was the case when Correa failed to return to work after his two-week leave or respond to Defendants' extensive communications regarding his plans. *Id.*; ECF No. 38-14 ("Ex. N") at 26–27. To be sure, Correa did receive documentation on February 3, 2022 indicating that his insurance had been cancelled. ECF No. 46-4 ("Ex. 4"). But Delta Stone reinstated Correa's insurance shortly thereafter and continued to pay for Correa's insurance premiums even as he failed to return to work or respond to communications. Ex. N at 27–28; ECF No. 62-1 ("Defs.' Reply Ex. 1").

Separately, Correa represents that he believes he was terminated based on the following text message sent from a safety manager at Delta Stone, Cody Sweat, on January 19, 2021:

> Hey, how are you doing? I haven't heard anything from you for some time. Aaron is telling me that they are going to have to terminate you as an employee because you haven't come to work, and you haven't communicated with anyone either. Everything—is everything okay with you? If they terminate as you as an employee, that is going to affect your medical insurance and everything. Can you please call me or—call or Ryan Farr before 12:00 p.m. today?

14

Ex. G at 54–55, 58–59 (emphasis added); Ex. P (the untranslated version of the text message sent in Spanish). However, Correa could not reasonably conclude that his employment had been terminated based on this text message, especially because it was not sent from a direct supervisor and he received extensive communication before and after the text message indicating that he was not terminated and welcome to return to work. While Defendants clearly were confused regarding Correa's employment status and whether he had voluntarily quit, the substance of their communications made clear that Correa was welcome to return throughout January and early-February 2022. Thus, Correa's contention that he was terminated by Defendants during this time period is simply not borne out by the evidence.

And even if Correa could establish that he was terminated during this time interval, there is insufficient evidence establishing a causal connection between this supposed termination and protected activity. If Correa had been terminated after receiving the Sweat text message on January 19, as he contends, the evidence suggests that this termination would have been based on his failure to "come to work" after his two-week leave and "communicate[] with anyone" regarding his return or need for additional time off. Ex. G at 55. This does not "justify an inference of retaliatory motive" in the manner necessary to establish the requisite causal connection. *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007) (citation modified).

Accordingly, the court enters summary judgment in Defendants' favor on Correa's ADA retaliation claim.

## III.    Nunez's Rehabilitation Act Claims

Nunez brings failure-to-accommodate and retaliation claims under the Rehabilitation Act, which creates certain prohibitions on discriminatory conduct that apply to "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The parties extensively debate whether

Defendants were under an obligation to comply with the Rehabilitation Act when "RMD received a [federally guaranteed] loan of $1,929,000" through the Paycheck Protection Program ("PPP") of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), 15 U.S.C. §§ 9001–9141. First Am. Compl. ¶ 114; Ex. C ¶ 10; Defs.' Mot. at 27–29; Pls.' Opp'n at 30–32. But the court need not resolve this dispute because Defendants' alleged misconduct occurred "after RMD's [PPP] loan was forgiven," at which point any obligations under the Rehabilitation Act had expired. Defs.' Mot. at 28–29. *See DiPietro v. Archbishop Wood High Sch.*, 711 F. Supp. 3d 488, 493 (E.D. Pa. 2024) ("[E]ven if a PPP loan created obligations under the [the Rehabilitation Act], those obligations would cease when the government forgives the loan."); *Winebrenner v. Elizabeth Ives Sch. for Special Child., Inc.*, No. 3:24-CV-1261 (AWT), 2025 WL 2201063, at *8 (D. Conn. Aug. 1, 2025) (holding that any obligations under the Rehabilitation Act triggered by PPP loans cease to apply when the loans are forgiven).

Both Rehabilitation Act claims are based on Plaintiffs' allegations that "Defendants refused to accommodate [Nunez's] disabilities" when they "gave him an ultimatum of working for a total of two to three hours per day or going against his provider's medical restrictions" by exposing himself to silica dust. First Am. Compl. ¶¶ 119–20, 128. But the undisputed evidence establishes that this ultimatum was issued in June 2021, after RMD's PPP loan was forgiven on May 6, 2021, when Defendants were under no legal obligation to comply with the Rehabilitation Act. Ex. H at 48–49; Ex. C ¶ 10; Ex. AC.

Consequently, the court enters summary judgment in favor of Defendants on Nunez's claims under the Rehabilitation Act. Even if Defendants revoked Nunez's reasonable accommodation and engaged in retaliation for protected activity, the alleged misconduct occurred too late to be cognizable under the Rehabilitation Act.

## IV.   FMLA Claims

Under the FMLA, both Correa and Nunez were "guarantee[d] the substantive rights of up to twelve weeks of unpaid leave . . . for serious health conditions and reinstatement to the former position or an equivalent one upon return from that leave." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006). Correa and Nunez assert that Defendants unlawfully interfered with their FMLA rights, which requires that they establish the following elements: "(1) that [they were] entitled to FMLA leave, (2) that some adverse action by the employer interfered with [their] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of [their] FMLA rights." *Id.* (quoting *Jones v. Denver Pub. Schs.*, 427 F.3d 1315, 1319 (10th Cir. 2005)) (citation modified); First Am. Compl. ¶¶ 142–48. But Nunez and Correa may only obtain relief under the FMLA if they can establish that they were "prejudiced by the [FMLA] violation[s]." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *Nebeker v. Nat'l Auto Plaza*, 643 F. App'x 817, 822 (10th Cir. 2016). It is this last requirement that is fatal to their FMLA claims. *See* Defs.' Mot. at 38–39 (moving for summary judgment based on a lack of prejudice).

Plaintiffs present substantial evidence that Defendants flagrantly violated the FMLA by failing to provide Correa and Nunez with adequate notice of their rights under the FMLA, both generally and specifically in Spanish. *See* Pls.' Opp'n at 39–40 (collecting evidence). However, such FMLA violations qualify as prejudicial "only when the employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, or suffers some loss in employment status remediable through appropriate equitable relief." *See Rodriguez-Ortega v. Rich*, No. 21-CV-01129 JCH/KK, 2023 WL 1861422, at *13 (D.N.M. Feb. 9, 2023). But here, there is no evidence that Correa and Nunez were prejudiced by Defendants'

FMLA violations in light of this standard. At most, Defendants' failure to comply with FMLA notice requirements prevented Correa and Nunez from taking unpaid FMLA leave. But Plaintiffs fail to offer any evidence that this failure to take unpaid FMLA leave materially harmed Correa or Nunez. *See* Pls.' Opp'n at 43–44. Plaintiffs assert that both Correa and Nunez "lost benefits including retirement and health insurance, as well as [their] standard wage compensation." *Id.* But there is no evidence suggesting that Correa and Nunez would have been entitled to wage compensation or retirement benefits during an unpaid FMLA leave. Nor is there any evidence that Correa and Nunez lost access to health insurance prematurely when it otherwise would have been available had they taken unpaid FMLA leave.

On the contrary, the evidence suggests that both Correa and Nunez simply had no desire to work for Defendants because of safety concerns related to their silicosis diagnoses. *See* Ex. G at 38–40; Ex. H at 49. In these circumstances—even if they arose from Defendants' own failure to provide safe working conditions and adequate warnings—facilitating Correa's and Nunez's ability to take unpaid FMLA leaves would not have made any practical difference. Plaintiffs, who would have the burden of proving prejudice at trial, fail to present any evidence indicating otherwise.

Thus, the court enters summary judgment in favor of Defendants on Correa's and Nunez's FMLA claims because there is insufficient evidence establishing that the alleged FMLA violations were prejudicial.

## V.  § 1981 Claims

Finally, the court addresses the § 1981 claims for racial discrimination brought by all three plaintiffs. First Am. Compl. ¶¶ 149–56. Plaintiffs allege that "Defendants discriminated against [them] based upon their race, color, ancestry, and ethnicity by assigning Spanish-speaking Latino employees of Mexican descent to uniquely dangerous working conditions as compared to their

white and native English-speaking colleagues" and "fail[ing] to provide Plaintiffs with complete information about the dangerous nature of the working conditions." *Id.* ¶¶ 151–52. To succeed on this claim, Plaintiffs "must establish that (1) [they are] member[s] of a protected class, (2) [they] suffered an adverse employment action, (3) [they] qualified for the position at issue, and (4) [they] were] treated less favorably than others not in the protected class." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012); *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008). Defendants move for summary judgment based on the second and fourth elements, arguing that the evidence establishes that Plaintiffs suffered no adverse employment action and received no disparate treatment. Def.'s Mot. at 40–44.

In response, Plaintiffs submit evidence supporting a reasonable inference that Plaintiffs were subject to disparate treatment because they were systematically misled about the risks from silica and were denied necessary safety information, unlike White, English-speaking employees who were adequately informed through separate meetings conducted in English. Pls.' Opp'n at 29–30; Ex. L at 59–60; Ex. H at 60–61; Ex. 3 ¶¶ 2–5; Ex. 6 ¶¶ 2–5; Ex. M at 34–35; Ex. K at 90, 105–06; Ex. 12 at 45–46; ECF No. 46-15 ("Ex. 15"); ECF No. 46-16 ("Ex. 16"); ECF No. 46-17 ("Ex. 17").

Even assuming that disparate treatment occurred, as the evidence suggests, it does not constitute an adverse employment action because it does not appear to involve any *change* in Plaintiffs' employment status.[4] *See Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir.

---

[4] Plaintiffs request the opportunity to file a sur-reply in connection to this issue. ECF No. 63 ("Pls.' Mot. for Leave to File Sur-Reply"). The court denies this request because Plaintiffs have already been given ample opportunity to respond to Defendants' arguments that Plaintiffs have failed to identify an adverse employment action in connection to their § 1981 claim. *See* Defs.' Mot. at 41–42.

2004) ("An adverse employment action is a detrimental *change* in the terms or conditions of employment.") (emphasis added); *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1237 (10th Cir. 2004) ("An adverse employment action constitutes 'a significant *change* in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant *change* in benefits.'") (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (emphasis added). In a recent Supreme Court case, which held that an employee merely had to show "some harm" to establish that a transfer counted as an adverse employment action, the Court still described the relevant inquiry as whether a "disadvantageous *change* in an employment term or condition" had occurred. *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 354 (2024) (citation modified) (emphasis added). And even in the case cited by Plaintiffs, where the Fourth Circuit held that reassigning an employee to a more dangerous job qualified as an adverse action, there was no question that a change in employment status had occurred. *Sherman v. Westinghouse Savannah River Company*, 263 F. App'x 357, 364–65, 370 (4th Cir. 2008); Pls.' Opp'n at 26–27.

Conversely, here, Plaintiffs were allegedly denied necessary safety information and misled about the risks of silica exposure from the start of their employment. Even if the standard for adverse employment actions should be interpreted "liberally" and "[s]uch actions are not simply limited to monetary losses in the form of wages or benefits," courts have consistently held that adverse employment actions involve a change in employment status. *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998), *abrogated on other grounds by Muldrow v. City of St. Louis,*

20

*Missouri*, 601 U.S. 346 (2024). Plaintiffs neither present any evidence that a change occurred nor present a single case finding an adverse employment action in similar circumstances.[5]

Separately, Plaintiffs contend that they experienced disparate treatment because "Defendants frequently moved the few White Laborers that existed off of the shop floor and into office positions without any formal hiring process that would have been open to Plaintiffs." Pls.' Opp'n at 30. But, as Defendants note, this theory is outside the scope of the allegations in the operative complaint. *See* First Am. Compl. ¶¶ 149–56; Defs.' Reply at 19. *See, e.g.*, *Purser v. Gilliland*, No. 22-CV-02374-GPG-RTG, 2024 WL 5276679, at *12 (D. Colo. Nov. 21, 2024), *aff'd*, No. 24-1503, 2025 WL 3553606 (10th Cir. Dec. 11, 2025) ("New theories of liability are not appropriately raised for the first time in a summary judgment response. Attempts to amend one's pleading through summary judgment briefing are improper.").

Accordingly, the court finds that there is no genuine dispute of material fact with respect to Plaintiffs' § 1981 claims and enters summary judgment in Defendants' favor.

---

[5] If this alleged disparate treatment did qualify as an adverse employment action, there would be further questions about the extent to which damages are available insofar Plaintiffs already receive worker's compensation benefits for the adverse health impacts of silicosis. *Cf. Adams Fruit Co. v. Barrett*, 494 U.S. 638, 651 (1990) ("We agree with the court below that an award of actual damages . . . may be offset in light of a farmworker's receipt of benefits under state workers' compensation law.").

## CONCLUSION AND ORDER

For the reasons above, the court GRANTS Defendants' motion for summary judgment. Notwithstanding the serious allegations raised by Plaintiffs, Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims.

DATED July 28, 2026

BY THE COURT

Jill N. Parrish
United States District Court Judge